UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DEREK D. FINGERS,

       Plaintiff,

    v.

COURTNEY BRIDENTHAL; SERENA
KENDALL; JESSICA KOONS; JADA
MILLER; BRADY HERRINGTON;
STEVEN PRICE; WALTER PINTAL;
MARGARET HEINE, a/k/a DEVORE;
BARBARA ANN GIBBS; and ALTA
JANE OVERHOLSER,

       Defendants.[1]

CAUSE NO.: 3:19-CV-525-RLM

<u>OPINION AND ORDER</u>

Plaintiff Derek D. Fingers, a prisoner without a lawyer, asserts violations of his Eighth Amendment right to be free from cruel and unusual punishment stemming from his mental health treatment while incarcerated by the Indiana Department of Correction at the Miami Correctional Facility from June 2018 through June 2019. His complaint includes:

- a claim against Nurse Courtney Bridenthal, for refusing to provide Mr. Fingers with his psychiatric medication around 7:00 a.m. on July 10, 2018;

---

[1] The caption has been amended to reflect the Defendants' full names and correct spellings as reflected in their summary judgment materials.

• a claim against Correctional Officers Serena Kendall, Jessica Koons, and Jada Miller, for preventing Mr. Fingers from receiving his psychiatric medication around 7:00 a.m. on July 17, 2018;

• a claim against Correctional Officers Brady Herrington and Steven Price, for harassing and threatening Mr. Fingers on January 29, 2019, so he would react in a way that would justify tasing him; and

• a claim against mental health professionals Walter Pintal, Margaret Heine, a/k/a Devore, Barbara Ann Gibbs, and Alta Jane Overholser, for refusing to provide treatment to him from July 17, 2018 to November 28, 2018. *See* ECF 4 at 13.

The defendants filed motions for summary judgment, Mr. Fingers filed a combined response, and reply briefs were filed. For the reasons that follow, the court grants the defendants' summary judgment motions. The discussion of the reasons for those rulings are divided into two parts: Part One addresses Mr. Fingers's claims against defendants Bridenthal, Kendall, Koons, Miller, Herrington, and Price, while Part Two addresses the claims against defendants Pintal, Devore, Gibbs and Overholser.

## STANDARDS OF REVIEW

### *Summary Judgment Standard*

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). Summary judgment is not appropriate if the court must choose between competing inferences or weigh the credibility of witnesses, since these are a jury's functions. <u>Abdullahi v. City of Madison</u>, 423 F.3d 763, 770 (7th Cir. 2005); <u>Keri v. Bd. of Trust. of Purdue Univ.</u>, 458 F.3d 620, 627 (7th Cir. 2006). The nonmoving party can't rely merely on allegations or denials in his own pleadings but instead must "marshal and present the court with the evidence [he] contends will prove [his] case." <u>Goodman v. Nat'l Sec. Agency, Inc.</u>, 621 F.3d 651, 654 (7th Cir. 2010). That a party doesn't have a lawyer doesn't ease this burden. <u>Arnett v. Webster</u>, 658 F.3d 742, 760 (7th Cir. 2011).[2]

## *Eighth Amendment Standard*

Inmates are entitled to constitutionally adequate medical care under the Eighth Amendment. <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976). To establish liability for a violation of this right, a prisoner must satisfy both an objective and subjective component. First, he must show that he had an objectively serious medical need.

---

[2] Dr. Pintal argues that the court shouldn't consider factual statements made in Mr. Fingers's summary judgment response brief because they are "unsworn and unverified." ECF 164. But Mr. Fingers's March 3, 2021 filing includes a declaration, sworn under penalty of perjury, that all factual statements in his summary judgment brief are true. ECF 167 at 3. The March 3 filing is among the documents that the court held would be "before the court for consideration when the merits of the summary judgment motion is considered." ECF 169. The declaration in the March 3 filing satisfies the sworn affidavit or declaration requirement of Rule 56 of the Federal Rules of Civil Procedure. *See* <u>Dale v. Lappin</u>, 376 F.3d 652, 655 (7th Cir. 2004). In any event, the court doesn't need to rely on any facts asserted in Mr. Fingers's response brief because the same facts can be found elsewhere in the record, i.e., Mr. Fingers's medical and other records produced by the defendants in discovery.

Second, he must show that the defendant acted with deliberate indifference to that medical need. Farmer v. Brennan, 511 U.S. 825, 834 (1994).

"A condition is objectively serious if failure to treat it could result in further significant injury or unnecessary and wanton infliction of pain." Reed v. McBride, 178 F.3d 849, 852 (7th Cir. 1999) (collecting cases) (internal quotation omitted). None of the defendants dispute that Mr. Fingers's mental illness is an objectively serious medical condition requiring treatment,[3] so the inquiry turns on the subjective "deliberate indifference" prong of the Eighth Amendment analysis. To establish "deliberate indifference," a plaintiff must show that the defendant "acted in an intentional or criminally reckless manner, i.e., the defendant must have known that the plaintiff was at serious risk of being harmed and decided not to do anything to prevent that harm from occurring even though he could have easily done so." Board v. Farnham, 394 F.3d 469, 478 (7th Cir. 2005) (internal quotation marks, brackets, and citations omitted). Deliberate indifference is a higher standard than negligence, incompetence, or even medical malpractice. Pierson v. Hartley, 391 F.3d 898, 902 (7th Cir. 2004). It is "something approaching a total unconcern for a prisoner's welfare in the face of serious risks," or a "conscious, culpable refusal" to prevent harm. Duane v. Lane, 959 F.2d 673, 677 (7th Cir. 1992).

---

[3] "The need for a mental illness to be treated could certainly be considered a serious medical need." Sanville v. McCaughtry, 266 F.3d 724, 733–734 (7th Cir. 2001).

DISCUSSION

*General Introduction*

Mr. Fingers has been in the Department of Correction's custody since July 2004 when he was convicted of Arson, a Class B felony, and sentenced to twenty years in prison with an additional twenty-year habitual offender enhancement,[4] for a total sentence of forty years. *See* Fingers v. State, 895 N.E.2d 739 (Ind. App. 2008). His prison medical records indicate he has suffered from mental illness dating back to when he was a young child. At some point before he arrived at the Miami Correctional Facility, a Department of Correction treating psychiatrist had classified Mr. Fingers's mental illnesses as atypical psychosis, antisocial personality disorder, and a history of multiple different substance abuse issues including alcohol. Mr. Fingers was prescribed three psychiatric medications to treat his mental illnesses, and continued to take those throughout his incarceration at the Miami Correctional Facility. Those medicines were Effexor to treat depression, taken once a day in the morning; Risperdal (or risperidone), to treat psychotic episodes, taken once a day in the evening; and Depakote for mood stabilization, taken twice a day in the morning and evening.

Immediately before his transfer to the Miami Correctional Facility, Mr. Fingers was incarcerated in the Intensive Residential Treatment program at Pendleton Correctional Facility. Another inmate tried to cut Mr. Fingers's throat with

---

[4] Mr. Fingers apparently had previous convictions for aiding criminal recklessness (1997, 1998), and resisting law enforcement and robbery (2001).

a razor in April 2018. ECF 161-1 at 143. For his own safety, he was moved from the Intensive Residential Treatment into the general prison population. Traumatized by the attack, Mr. Fingers spent forty out of sixty days on suicide watch. He covered his cell door with his mattress and attempted suicide by cutting his wrists. He was transferred from Pendleton to the Miami Correctional Facility three weeks later, on June 22, 2018.

## Part One

### *Facts[5]*

Mr. Fingers's claims against Defendants Bridenthal, Kendall, Koons, Miller, Herrington, and Price arise out of three incidents occurring on July 10, 2018, July 17, 2018, and January 29, 2019. A fourth incident occurring on July 18, 2018 sheds further light on the three incidents at issue.

**July 10, 2018.** Miami Correctional Facility inmates are dispensed medications once in the morning and once in the evening through a procedure known as the "medicine line." The morning medicine line takes place as early as 5:30 or 6:30 a.m., and Mr. Fingers wasn't let out of his cell in time that day. Around 7:00 a.m., he asked "Sergeant Nice" if he could go to the medical building to get his missed morning medications from the nurse. Sergeant Nice called the medical unit and spoke with Nurse Bridenthal. Nurse Bridenthal told Sergeant Nice that Mr. Fingers couldn't get

---

[5] For purposes of the defendants' summary judgment motions, the court construes all facts and draws all reasonable inferences in the light most favorable to Mr. Fingers. Ogden v. Atterholt, 606 F.3d 355, 358 (7th Cir. 2010).

his medications after the morning medicine line had ended because the morning and evening dosages had to be spaced a certain length of time apart. Mr. Fingers contends he suffered "a mania/manic, psychotic, and schizophrenia episode . . . where he took a broom stick and started hitting the walls, cell doors, and light fixture inside the housing unit" as a result of missing his morning medications.

**July 17, 2018.** On this day, Mr. Fingers again arrived late to the morning medicine line. Sergeant Nice gave him permission at around 7:12 a.m. to go to the medical building for late administration of his medicines. But as he arrived at the medical building, Sergeants Kendall, Miller, and Koons intervened. Mr. Fingers told them he had permission from Sergeant Nice to go to the medical building to get his psychotropic medication, but the three officers responded in a "loud" and "disruptive" manner." Mr. Fingers "made the decision to walk around" them, but they followed behind him and interfered with him "trying to receive [his] medication." Mr. Fingers threatened suicide if he didn't get his medication. The defendants handcuffed Mr. Fingers inside the medical building and left him there for hours.[6]

**July 18, 2018.** The next day, Mr. Fingers was ordered to go with four or five other inmates who also were on suicide watch "for a suicide observation review" and

---

[6] The court sets forth the evidence in the light most favorable to Mr. Fingers, but other evidence in the record shows that Mr. Fingers's initial interaction was with Sergeant Kendall only. ECF 161-1 at 126. It also indicates that Sergeant Kendall was with unidentified medical staff when Mr. Fingers was told that medications could not be passed outside the medicine line because doing so could result in them being received too close together. Mr. Fingers then became loud and disruptive, drawing the attention of Sergeants Koon and Miller who came to provide assistance to Sergeant Kendall. Mr. Fingers was asked to leave, whereupon he asserted he was suicidal. He was left in the medical office because Sergeant Kendall had to make arrangements for his transfer to a suicide watch cell. ECF 161-3 at 19; ECF 161-1 at 127.

administration of morning medications. Mr. Fingers didn't want to go because his mental illness had been "exacerbated" by having been deprived his medicines the previous day. But his request that his morning medicines be brought to his cell instead was refused. When he got to the medical building, Mr. Fingers met with Clinical Psychologist Fania Lee, PsyD for a suicide observation review. Dr. Lee reported that Mr. Fingers was upset he had missed his medications the previous day. Mr. Fingers became upset when Dr. Lee told Mr. Fingers that he needed to go through proper procedure to get his morning medications. He began yelling that he didn't want to talk to Mental Health anymore, didn't want to take his medications, and was going on a hunger strike. He walked out of Dr. Lee's office without allowing her to respond.

Back in the room with the four or five other inmates who were waiting on their suicide observation review, Mr. Fingers said out loud that he was hearing voices and then began throwing furniture against the door to barricade himself and the other offenders inside. Mr. Fingers explains that he was suffering a "schizophrenia, psychotic and mania/manic episode" at the time, "where the voices got so bad, and attacked [him] and drove him insane," causing him to do those things.[7] Additional

---

[7] Mr. Fingers received a disciplinary report for rioting as a result of this incident. He later filed a habeas petition asserting he was improperly sanctioned for conduct that was caused by his mental illness. His habeas petition was denied. *See* Fingers v. Warden, No. 3:19-cv-20, 2020 WL 638523 (N.D. Ind. Feb. 11, 2020). Mr. Fingers has filed quite a few other habeas petitions in this district making the same argument that penalties imposed on him for conduct infractions were improper due to his mental illness, all of which have been either denied or dismissed. *See* Fingers v. Warden, No. 3:19-cv-131 (*filed* Feb. 26, 2019, *denied* Feb. 11, 2020); Fingers v. Warden, No. 3:19-cv-132 (*filed* Feb. 26, 2019, *denied* July 3, 2019); Fingers v. Warden, No. 3:19-cv-134 (*filed* Feb. 26, 2019, *denied* Aug. 11, 2020); Fingers v. Warden, No. 3:19-cv-135 (*filed* Feb. 26, 2019, *dismissed* Apr. 14, 2020); Fingers v.

correctional officers were called to the scene, and Mr. Fingers ultimately was convinced to let himself be handcuffed so he could talk to Warden Hyatte, who was waiting outside the room. Mr. Fingers "became extremely emotional" during his conversation with Warden Hyatte, and the warden asked if he (Mr. Fingers) had received his morning psychotropic medicines. Hearing that Mr. Fingers had not yet gotten his psychotropic medicines that morning, the warden directed Nurse Bridenthal to give them to him.

**January 29, 2019.** As Mr. Fingers came out of his cell for breakfast that morning, he asked Sergeant Herrington to hold the door for him. Sergeant Herrington responded by calling Mr. Fingers a "retard" and getting "into a fighting stance." Sergeant Herrington had been harassing Mr. Fingers all morning to the point where another sergeant had to intervene, telling Sergeant Herrington to leave Mr. Fingers alone and taking Mr. Fingers into another room to calm him down. After that sergeant had to leave for training, Sergeant Herrington continued to provoke Mr. Fingers. Mr. Fingers went to Counselor Price for help, saying he couldn't "take it" anymore and was "about to lose control of [himself]." Counselor Price replied that Mr. Fingers shouldn't be out of his cell and that he (Counselor Price) was going to call Sergeant Herrington over to physically put Mr. Fingers back in his cell. Counselor Price told Mr. Fingers "to take your black ass to your cell," and warned Mr. Fingers that he and Sergeant Herrington "would come and physically put him" in his cell.

---

Warden, No. 3:19-cv-136 (*filed* Feb. 26, 2019, *dismissed* Mar. 4, 2019); Fingers v. Warden, No. 3:19-cv-205 (*filed* Mar. 22, 2019, *dismissed* Apr. 14, 2020).

Counselor Price's words caused Mr. Fingers "to lose control over himself" by running up to Counselor Price, who then kicked Mr. Fingers, causing him to fall back. Mr. Fingers got up and hit Counselor Price three times. Mr. Fingers claims he was having a psychotic episode, and backed off once he realized what he was doing. But then he saw Sergeant Herrington coming and "flipped out again," this time hitting another sergeant. A third sergeant, responding to Mr. Fingers's physical aggression against the other correctional officers, tased him.

*Analysis*

*Nurse Bridenthal*

Nurse Bridenthal raises a number of factual arguments for why she is entitled to summary judgment on Mr. Fingers's deliberate indifference claim against her for refusing to administer his psychiatric medication on the morning of July 10, 2018.

Even if all the parties' factual issues are resolved in Mr. Fingers's favor, the evidence isn't sufficient to support a jury finding against Nurse Bridenthal on the two prongs of the deliberate indifference test. Those two prongs require sufficient evidence for a jury to find (1) that there was a substantial risk of Mr. Fingers sustaining a serious injury as a result of not receiving his morning medications, and, if so, (2) that Nurse Bridenthal was subjectively aware of it. Gayton v. McCoy, 593 F.3d 610, 623 (7th Cir. 2010).

Mr. Fingers has presented no evidence to show that a single missed morning dosage of his medication posed a substantial risk of exacerbating his mental illness.

*See* Williams v. Liefer, 491 F.3d 710, 714-15 (7th Cir. 2007) (the delay in treatment, rather than the underlying serious mental illness, must be the cause of the risk of harm suffered by the plaintiff). No reasonable jury could credit Mr. Fingers's testimony that his behavioral outburst with the broom later that day was caused by the single missed dosage when there is no medical testimony attesting to that causation theory. Further, the evidence shows that Mr. Fingers met with the prescribing nurse practitioner later that day, and she reported he showed no signs at that time of suffering any current symptoms of mental illness. Finally, contrary to Mr. Fingers's representations, the only change to his psychiatric medications that resulted from his session with the psychiatric nurse was an increase in Risperdal, which is given in the evening and so wasn't one of the missed morning medications.

On the second prong of the deliberate indifference inquiry, assuming a single missed dosage of morning medicine would pose a serious risk of exacerbating Mr. Fingers's mental illness, Mr. Fingers hasn't pointed to any evidence showing that Nurse Bridenthal knew that was the case. For instance, there is no evidence that Nurse Bridenthal was aware of the nature and extent of Mr. Fingers's mental health issues other than that he had been prescribed psychiatric medications. This knowledge by itself doesn't support a claim that Nurse Bridenthal was aware he was at risk of a serious aggravation to his mental health by a single missed dosage. And her knowledge of the July 18 incident in which the warden ordered that Mr. Fingers be given his morning medicine after Mr. Fingers instigated a riot with four or five other inmates doesn't add to the analysis, because that happened after July 10. Apart

from that timing, the incident itself wouldn't support a reasonable inference that Nurse Bridenthal had subjectively concluded either beforehand or afterwards that Mr. Fingers's missed dosage of medicines was connected with his problematic conduct.

Mr. Fingers says there were repeated delays in receiving his psychiatric medicines at the Miami Correctional Facility and that those repeated delays caused him to suffer a deterioration of his mental health over a longer period of time. Mr. Fingers's medical records suggest his mental health might have deteriorated in the fall of 2018, and there might have been additional incidents in that time period of missed dosages of medications. The record contains no evidence that would allow a reasonable jury to distinguish the medical effects of the alleged missed dosages of his psychiatric medicines from the effects of Mr. Fingers's preexisting mental illnesses. And in any event, Mr. Fingers hasn't presented any evidence to show that Nurse Bridenthal personally participated in the repeated delays of which he complains. The evidence at most shows that she potentially participated in some way in only three instances involving Mr. Fingers not receiving his morning dosages—July 10, 17, and 18. Disregarding Mr. Fingers's unsupported assertions and viewing the evidence most favorably to him, a reasonable jury simply couldn't infer that a systemic problem existed in the Miami Correctional Facility's administration of Mr. Fingers's medicines for which Nurse Bridenthal can be held responsible. *See* Sanville v. McCaughtry, 266 F.3d 724, 734 (7th Cir. 2001). (a defendant can only be held liable for the actions or omissions in which she personally participated).

*Correctional Officers Kendall, Koons and Miller*

Mr. Fingers says defendants Kendall, Miller, and Koons violated his Eighth Amendment right to be free from cruel and unusual punishment because they prevented him from receiving his psychotropic medication on the morning of July 17, 2018.

Our court of appeals recognized the division of labor between medical staff and administrative staff in Greeno v. Daley, 414 F.3d 645 (7th Cir. 2005), in which the court found that when a prison official refers the matter to medical professionals, a failure to act further can't be viewed as deliberate indifference. *Id.* at 655-656 (agreeing with Spruill v. Gillis, 372 F.3d 218, 236 (3rd Cir. 2004)); *see also* Estate of Miller v. Marberry, 847 F.3d 425, 427 (7th Cir. 2017); Hayes v. Snyder, 546 F.3d 516, 527 (7th Cir. 2008). Only if nonmedical officers have a reason to believe that medical personnel are not treating a prisoner, or else they interfere with that treatment, can nonmedical officers be found deliberately indifferent. King v. Kramer, 680 F.3d 1013, 1018 (7th Cir. 2012).

Mr. Fingers argues both situations apply. First, he argues the three defendants interfered with his getting his medicine. The three defendants state (with support in the record) that their involvement in the July 17, 2018 incident "was limited to performing [their] duties as a Correctional Sergeant/Caseworker," and that none of their actions on the morning in question did or was intended to interfere with Mr. Fingers's medical care. But those assertions are conclusory, and unsupported by

any description or explanation of each defendants' conduct in relation to the incident, so the court turns to Mr. Fingers's description of what happened. He says the three defendants didn't keep him from entering the medical building to get his morning medicine; he says he walked around them to enter the building. Based on Mr. Fingers's description of what happened, it was the medical staff that made the decision to not give Mr. Fingers's his medicines, not any of the three defendants. There is no evidence that the three defendants prevented the nurse from giving Mr. Fingers his medicines.

Mr. Fingers also argues the second situation applies here: defendants Kendall, Miller, and Koons could have "used their custody influence" to interfere on Mr. Fingers's behalf by directing Nurse Bridenthal to give Mr. Fingers his psychotropic medication, as the warden had done. The three defendants are correctional officers who don't have the same "custodial" power as a warden has. More importantly, the officers had no reason to believe that the nurse wasn't exercising her professional judgment when she refused Mr. Fingers his medications. Even if these three defendants could have ordered the medical staff to give Mr. Fingers his medicines, no evidence could support a finding that any of them had reason to question the medical staff's apparent exercise of professional judgment that it was too late for Mr. Fingers to receive his medicine.

In short, the record contains no evidence to suggest that these defendants had any reason to believe that medical personnel responsible for distributing medications were acting inappropriately. No reasonable trier of fact could find that Sergeants

14

Kendall, Miller, and Koons were deliberately indifferent to any serious medical need of Mr. Fingers on July 17, 2018. *See* Burks v. Raemisch, 555 F.3d 592, 596 (7th Cir. 2009) ("[a] layperson's failure to tell the medical staff how to do its job cannot be called deliberate indifference").[8]

### *Correctional Officers Herrington and Price*

Mr. Fingers contends that Defendants Herrington and Price violated his Eighth Amendment right to be free from cruel and unusual punishment by provoking him to act in a way that would justify his tasing.[9]

Read in the light most favorable to Mr. Fingers, the record shows only that Sergeant Herrington deliberately taunted or harassed him, while Counselor Price was disrespectful and callous in his response to Mr. Fingers's complaints about Sergeant Herrington. The conduct Mr. Fingers describes doesn't support a constitutional claim. *See* DeWalt v. Carter, 224 F.3d 607, 612 (7th Cir. 2000) ("[S]imple verbal harassment does not constitute cruel and unusual punishment, deprive a prisoner of a protected liberty interest or deny a prisoner equal protection of the laws.").

---

[8] Mr. Fingers's deliberate indifference claim against these defendants also fails for the reasons previously discussed with regard to Nurse Bridenthal: there is no evidence in the record that a single missed dosage of medicine posed a serious risk of exacerbating Mr. Fingers's mental illnesses or, if it did, that these defendants were aware of the risk.

[9] Mr. Fingers doesn't contend that the correctional officer who tased him used excessive force. Nor could he, given Mr. Fingers's physical attacks on Counselor Price and a third correctional officer. *See* Hendrickson v. Cooper, 589 F.3d 887, 890 (7th Cir. 2009) (stating that the "core requirement" for an excessive force claim is that the defendant "used force not in a good-faith effort to maintain or restore discipline, but maliciously and sadistically to cause harm").

Mr. Fingers testified that taunting and harassment by correctional employees is something that routinely happens to inmates with serious mental illnesses because correctional officers want mentally ill inmates housed in restrictive housing units rather than in the general prison population. So correctional officers "try to provoke those kinds of prisoners, who then fall into the trap by responding to the provocation and then end up in lockup."

Assuming such allegations could give rise to an Eighth Amendment claim for wanton infliction of psychological pain,[10] Mr. Fingers hasn't met his burden of presenting enough evidence to support a finding in his favor. There is no evidence from which a jury reasonably could infer the state of mind that Mr. Fingers attributes to defendants Herrington and Price: an intentional provocation with the purpose of inciting Mr. Fingers to violence so that he could then be tased in response to that violence. *See, e.g.,* Denton v. Trasher, No. 3:18-CV-5017-BHS-DWC, 2020 WL 5350656, at *16 (W.D. Wash. Mar. 20, 2020) (rejecting prisoner's claim that verbal harassment violated the Eighth Amendment because it caused him psychological harm, in light of his mental health issues, where there was no evidence that the "defendant's actions were 'calculated to' cause such [psychological] damage"), *report*

---

[10] *See* Leiser v. Kloth, 933 F.3d 696, 703 (7th Cir. 2019) (listing cases in which the alleged conduct unrelated to penological interests inflicted psychological torment and humiliation sufficient to give rise to an Eighth Amendment claim); Northington v. Jackson, 973 F.2d 1518, 1525 (10th Cir. 1992) (holding that a prisoner stated an Eighth Amendment claim when he alleged that the defendant correctional officer "intended to do harm to [him] by inciting inmates to beat him").

*and recommendation adopted in part, rejected in part on other grounds*, No. C18-5017 BHS, 2020 WL 3529809 (W.D. Wash. June 29, 2020).

Mr. Fingers's allegations of a general pattern or practice among correctional officers are conclusory. The facts contained in this summary judgment record relate to only a single name-calling incident involving two correctional officers. Moreover, Mr. Fingers does not allege, let alone present evidence to show, that Counselor Price's or Sergeant Herrington's ridicule and taunting exacerbated his underlying psychological condition and that worsened psychological condition then caused the violence for which Mr. Fingers was tased. Even with Mr. Fingers's unsupported and speculative testimony about the motives of Sergeant Herrington and Counselor Price, no reasonable jury could find on the current record that Mr. Fingers lacked control over his conduct in response to the harassment and taunting such that the taunting itself, rather than Mr. Fingers's violent response to the taunting, could be said to have caused Mr. Fingers to be tased. Finally, even if Mr. Fingers's could show otherwise, he hasn't presented any evidence to show that Sergeant Herrington and Counselor Price knew their conduct would make Mr. Fingers's mental illness worse, or knew that Mr. Fingers couldn't control his conduct because of his mental illness. Mr. Fingers hasn't shown that Sergeant Herrington and Counselor Price put him at risk of suffering a constitutional harm or that they acted with constitutionally cognizable culpability.[11]

---

[11] Sergeant Herrington and Counselor Price also argue they are entitled to qualified immunity. Because the court finds their motion for summary judgment should be granted on alternative grounds, this argument need not be addressed.

## Part Two

### *Facts[12]*

The facts discussed in this part are taken primarily from Mr. Fingers's prison medical records, grievance records, and requests for health care. The relevant time frame for Mr. Fingers's claims against defendants Pintal, Devore, Gibbs, and Overholser is July 17, 2018 to November 28, 2018. *See* ECF 4 at 13.

**July 2018.** Ms. Gibbs, Ms. Devore, and nursing staff monitored Mr. Fingers for suicide from July 17-18. On July 20, he met with Ms. Overholser for the first time. He told her that he didn't want any mental health treatment and believed he shouldn't be held responsible for conduct reports due to his history of mental illness. Ms. Overholser told Mr. Fingers that despite his mental illness, she believed he knew the difference between right and wrong and so was responsible for his conduct. Ms. Overholser noted in her report that Mr. Fingers's mental diagnoses included only a mood disorder and antisocial personality disorder. She said that Mr. Fingers's symptom report was questionable since she saw no observable signs of anxiety, anger, agitation, depression, or cognitive/intellectual limitations. She saw no indication of impulse control issues, psychosis, mania, or suicidal/homicidal ideation. She reported that Mr. Fingers's attitude was demanding and manipulative, and that in her opinion, he didn't present any mental health issues then.

---

[12] *See* note 5, *supra.*

18

Mr. Fingers met with Ms. Overholser again on July 23. He spent much of the session arguing about his prior conduct reports again. He claimed his mental health "was off chain," and said he "would have [Ms. Overholser's] head on a platter" and "take [her] down" for "not knowing" his mental health history. He called her "a bitch" and threatened to "get the courts and IDOC involved." Ms. Overholser ultimately had custody personnel remove him from her office. Aside from being hostile, demanding, and manipulative, Ms. Overholser saw no mental health issues and discontinued Mr. Fingers on suicide watch. Ms. Overholser met with Mr. Fingers again the next day. Mr. Fingers wanted to know when he could be moved out of restrictive housing. Ms. Overholser told him that he had to remain there for the time being due to a conduct report he had received. Ms. Overholser reported that Mr. Fingers "was exhibiting poor insight and strong access to features of his prior diagnosis of antisocial personality disorder."

On July 30, Mr. Fingers met briefly with Ms. Devore after reports that he had threatened to "slice his wrists." Ms. Devore determined he didn't have any mental health issues at that time.

**August 2018**. On August 6, Mr. Fingers met with Dr. Pintal, who wrote in his session notes that Mr. Fingers "denied having any current [mental health] needs." Dr. Pintal also wrote that Mr. Fingers "spoke at length" about something being "wrong" with him, describing voices in his head that got so loud at times he had difficulty controlling himself. Dr. Pintal wrote that he responded to Mr. Fingers's mental health concerns by encouraging him "to reframe his thinking from 'control' to

19

'management'" and "accept that he is responsible for his behavior." Mr. Fingers interpreted Dr. Pintal's words differently. He testified at his deposition that Dr. Pintal actually said was that "it was his [Dr. Pintal's] job to make sure that he [Mr. Fingers] never got out of prison."

Mr. Fingers met with the psychiatric nurse for medication management on August 13. Together they decided to increase Mr. Fingers's dosage of Effexor for depressed mood, while maintaining the other two medications at the same level. A week later, Mr. Fingers met with Ms. Gibbs, who reported that Mr. Fingers was pleasant and talkative with "no observable signs of significant impairment or distress." His "focus" in the session was on his belief that he should be placed in an off-site psychiatric hospital. He also spoke of his plans to write the governor and judges about his need to be released from prison, and he wanted Ms. Gibbs "to understand" his supposed role with the "IPAS settlement."[13] Ms. Gibbs noted that, although Mr. Fingers had been transferred to the Miami Correctional Facility two months earlier, he hadn't yet had a mental health intake assessment, probably because it had been deferred because of his placement on suicide watch shortly after his arrival.

---

[13] Mr. Fingers was referring to a settlement in a lawsuit brought by the Indiana Protection and Advocacy Services Commission ("IPAS") against the IDOC in which a district court in the Southern District of Indiana had ruled after a bench trial that the IDOC had violated the Eighth Amendment by placing seriously mentally ill prisoners in isolation with little or no access to treatment. See Ind. Prot. & Advoc. Servs. Comm'n v. Comm'r, No. 1:08-cv-1317-TWP-MJD, 2012 WL 6738517 (S.D. Ind. Dec. 31, 2012).

Dr. Lee conducted the intake mental health examination of Mr. Fingers, which lasted several hours, on August 28. Mr. Fingers told Dr. Lee detailed information about his mental health history starting around age six, including suicide attempts such as jumping into heavy traffic for no reason, hearing and seeing things, and having odd beliefs, perceptions, and body sensations such as feeling an invisible force push him down the stairs, a pulling behind his eyes, and a sense that his face was not his own. Mr. Fingers also reported a history of violence starting at around age fifteen, including an incident in which he tied his mother and two sisters up because "something just [told] him to 'kill em, kill em, kill em.'" Mr. Fingers estimated at least four inpatient hospitalizations as a child, including his mother having committed him to an institution because she thought he was 'Damien.'"

Mr. Fingers also spoke to Dr. Lee about his current mental health symptoms. including persistent auditory hallucinations when in restrictive housing, as well as feeling "the presence of an entity" that pushes or holds him down and forces him to smile or change his demeanor. He said there were times he could "just flip out," particularly if he was in his cell for a long time and the voices started to take over. Mr. Fingers talked of a rattling in his head and the voices telling him to hurt himself. He said the voices were unmanageable at times, telling him to do things that only led to more trouble for him. His medications help somewhat by sedating him, and a television also helps by drowning the voices out. Dr. Lee noted that Mr. Fingers showed "some paranoid thoughts as well as tangential thinking." She also noted that

it was necessary "to rule out drug-induced psychosis from extensive use of mind-altering drugs." She made no changes to Mr. Fingers's diagnoses.

**September 2018.** Mr. Fingers met a second time with Dr. Lee on September 14, apparently so that Dr. Lee could get clarification about a request Mr. Fingers had made for copies of his mental health records. Mr. Fingers explained that he needed the records to show that he was a schizophrenic and that his mental health was deteriorating in the restrictive housing unit where he was being held. Mr. Fingers also had a medication counseling session that day with a psychiatrist, Dr. Alfredo Tumbali, M.D., who continued his psychiatric medications as before.

On September 20, Mr. Fingers met with Ms. Devore. He reported to her that he did not like being at the Miami Correctional Facility and wanted to be transferred. He told her that he was writing to Congress about how the criminal justice system fails and there should be a different way of punishing/rehabilitating offenders. He also told her "how the frontal lobe [of the brain] where mental health issues are . . . also affects behaviors so he believes they are one [and] the same." He reported feeling as if he has other souls or people come into his body and speak through him. He felt the need to please the voices and more or less "be their servant" so that, "what mood the people are in determines how his day goes." He also claimed that he "changes facial shape" to match the voices inside him. His medications helped but didn't stop the voices or these feelings, which were present on a regular basis. Ms. Devore concluded that Mr. Fingers's anxiety, cognitive issues, depression, impulse control,

and psychotic symptoms were "not significant," and that Mr. Fingers didn't present any mental health issues at that time.

Mr. Fingers met for a therapy session with Dr. Lee on September 25. He reported "feeling a person inside him, then he thought it was a device." He said voices had bothered him all week. Dr. Lee wrote that it was not "evident" he was suffering from hallucinations. Mr. Fingers also spent time in the session protesting against prison rules that would not allow him to get his medication if he was five minutes late to the medication line, as well as expounding on his theory that conduct offenses were mental health related. Dr. Lee described Mr. Fingers as presenting with grandiose ideas about himself and attributing his conduct infractions to "psychosis" rather than "personal choices and/or shaped by life experiences."

**October 2018.** Mr. Fingers saw Stephanie Copeland, PsyD. for a therapy session on October 1. Dr. Copeland's medical notes, similar to Dr. Lee's August assessment, describe Mr. Fingers's report of a long history of childhood mental illness as well as current symptoms of hearing voices and feeling like forces are taking over his body. Dr. Copeland noted that it was necessary to rule out schizotypal personality disorder, and that Mr. Fingers's reported symptoms of anxiety, cognitive issues, and psychosis were "significant."

Mr. Fingers saw Dr. Copeland for another therapy session on October 11. She found him to be irritable this time, with a "loose racing" thought process. He complained about not getting medication and having conduct issues as a result, and he expressed his concern that his mental health needs weren't being met. He also

repeated previous "narratives of feeling other forces or people in him and wrestling with reportedly multiple personalities." Dr. Copeland acknowledged in her session notes that Mr. Fingers had symptoms of auditory hallucinations and obsessional paranoid thought content. She noted her attempt to explore the possibility of "maladaptive schemas" and "hidden agenda regarding manipulating clinician," while concluding that Mr. Fingers had "significant" psychotic symptoms.

On October 18, Ms. Overholser met with Mr. Fingers. She wrote that Mr. Fingers "claimed" to have auditory command hallucinations, but that there was "no evidence" he actually experienced those things, remarking that his only mental health diagnoses were a mood disorder, antisocial personality, and a third diagnosis labeled "NOS" or "not otherwise specified." Mr. Fingers reported he was "not doing too good." He felt "weird" in his current housing placement, and claimed to be having out-of-body experiences of hearing people who weren't there talking to him in his cell. Mr. Fingers also reported that he couldn't get his medications and "flipped out," resulting in a conduct report that was going to prevent him from participating in a program or getting a job for another year. Ms. Overholser assessed Mr. Fingers as having no significant anxiety, cognitive issues, depression, impulse control issues, or psychotic symptoms. She reported that he demonstrated "[s]ome circular thinking subjective more about debating the issues," but concluded he had "no blatant" mental health issues that needed to be addressed.

Later that day, Mr. Fingers submitted a request for health care in which he complained that Ms. Overholser didn't have a PhD in mental health, wasn't qualified

to weigh in on his diagnoses, "became nasty and angry with him," and "told him to get out." Mr. Fingers submitted another request for health care the next day in which he stated that he realized he "need[ed] to see a psychiatrist" after waking up to find he was in segregation and naked "in a shower with shit all over [himself]." He also said he had been denied his medication, which he "really need[ed]" because his therapy session the previous day with Ms. Overholser had subjected him to "stress and depression," causing him to mentally deteriorate.

Mr. Fingers had a therapy session with Ms. Gibbs on October 23. He shared "his dislike for the mental health treatment" at the Miami Correctional Facility and his desire "to parole to California because the care there is far superior to that in Indiana." He reported that he was "feeling like there are five female voices interfering with his thinking," and that "one voice [was] very dangerous, but . . . [the] other voices keep the dangerous one at bay." Ms. Gibbs suggested Mr. Fingers "reframe" his "self-reports" of auditory hallucinations by telling himself he could "compensate for the 'evil' voice by listening to the 'good' voices." Ms. Gibbs wrote in her session notes that Mr. Fingers had "[n]o observable signs of responding to internal stimuli or distress," and concluded he had no significant mental health issues at that time.

On October 24, Mr. Fingers filed another request for health care asserting he had a "rare and serious" mental illness that hadn't been "correctly diagnose[d]" because it was being "covered up." Five days later he was brought to the medical office handcuffed in the back and in an agitated state. He told the nurse he was suicidal and homicidal, and said he wasn't going to take his medications or eat anymore. He

was placed on suicide watch and Ms. Overholser was notified. It appears that this was around the date that Mr. Fingers's housing unit went into lockdown.

Mr. Fingers was seen by Ms. Overholser on October 30. He wouldn't speak at first, but responded to a correctional sergeant's questions by angrily asserting that the entire mental health staff was mistreating him. Ms. Overholser reported that Mr. Fingers wasn't taking responsibility for his actions, displayed possible narcissistic/histrionic traits, and viewed himself as a victim. She ended the therapy session because of the attitude he displayed towards her, and told correctional officers to take him to be assessed by the medical staff instead. She wrote in Mr. Fingers's medical records that he didn't present any mental health issues at that time.

On October 31, Mr. Fingers filed another request for health care in which he said Ms. Overholser had become "angry and nasty" when she couldn't answer his questions, telling him to get out of her office. He wanted "her to stop occupying" the position of "a psychiatrist or a psychologist," and also complained that he was denied his psychiatric medication that day. Mr. Fingers saw Ms. Gibbs the same day he submitted this latest request for health care. He denied any suicidal or homicidal ideation and wanted to have a lengthy conversation about which staff members were eligible to diagnose him and which were not. Ms. Gibbs observed that "[t]his appears to simply be [Mr. Fingers's] normal routine." She also observed that he didn't present with signs of distress, psychosis, bizarre behaviors, or difficulty concentrating or communicating.

**November 2018.**   On November 6, Mr. Fingers saw Ms. Overholser. He had recently been given a cellmate and reported that he couldn't sleep with another person in the cell. He acted out by smearing feces on the cell walls and threatening his cellmate with physical harm. He told Ms. Overholser he didn't feel suicidal, but his illness was much worse. She noted that he was "highly articulate and talkative non-stop," "[d]escribing that furnace[s] [and] air conditioners actually [make] sounds that talk to [him]," and he "kept asking to see Dr. Pintal who he seems to have affinity [for]." Ms. Overholser concluded from these observations that Mr. Fingers had "[n]o other pressing [mental health] concerns," and "[n]othing so serious presenting of concern" to require any change in his placement.

In a November 8 request for health care, Mr. Fingers complained that, given his attempted suicide only months earlier at Pendleton, his current mental health classification should be more serious (a "D" rather than a "C"). He also complained that his mental health diagnosis should include schizophrenia. Two days later, Mr. Fingers submitted a grievance in which he again complained about Ms. Overholser's qualifications, and said he wasn't getting adequate therapy sessions or being properly diagnosed. In another grievance submitted the same day, Mr. Fingers said he was "a seriously delusional schizophrenic" and that his "mental health primary" care providers (defendants Overholser, Gibbs, and Devore) were trying to conceal it. He reported hearing voices in his head that were going to make him kill his cellmate. He warned a sergeant about being suicidal and homicidal, was placed on suicide watch for less than twenty-four hours, and then returned to the

same cell with the same cellmate. He reported that the voices told him they would stop if he smeared feces on the walls and door of the cell, and when that didn't help, he "tried to take [his] cellmate's brain and put it in [his own] skull to stop the voices." His cellmate "ended up with razor cuts all over his head." Prison officials moved his cellmate out, but Mr. Fingers continued to smear feces all over the cell. Prison officials cut off the water to his cell.

Ms. Overholser saw Mr. Fingers again on November 14. She wrote in her sessions notes that before she walked up to the cell door, she heard Mr. Fingers singing and talking to his cellmate. Mr. Fingers told her that he "could not handle" being in lock-down, but he denied any thoughts of suicide. Ms. Overholser reported she didn't observe any notable mental health-related issues. Three days later, Mr. Fingers proclaimed he was on a hunger strike because the voices were telling him not to eat. A nurse reported that he refused his medications, had urinated on the cell floor, and had smeared feces on the window. Ms. Gibbs was made aware of the situation.

In a November 19 request for health care, Mr. Fingers complained that he couldn't be locked down in his cell for a long period of time. He said he had been "laying in a cell full of feces and urine with no sink water or toilet flush." Two day later, Mr. Fingers "calmly" reported to a nurse he had been removed from his cell for spreading fecal matter on the walls, and when she asked him to elaborate, he said that he "get[s] all strung out" from "being trapped in" his cell, and then he starts to hear the voices, which cause him "real bad pain" in his face, jaw, and head if he doesn't

listen to them. The nurse asked if he wanted her to contact mental health, and he said, "No, I don't get along with mental health here . . . they stole my schizophrenia diagnosis and labeled me anti[-]social."

Mr. Fingers's scheduled November 23 session with Ms. Devore was cancelled due to the lock-down. A correctional officer reported to Ms. Devore that Mr. Fingers had calmed down from before. On November 27, Mr. Fingers submitted a request for health care in which he stated that "[w]hile in lock down … [he] ha[d] been laying in a cell full of feces, urine and trash," and "the voices won't leave [him] alone," telling him to "stove [sic] people's eyeballs out and smear feces in people's faces and all over [his] cell." He felt the treating mental health practitioners were "against [him]" and were "trying to conceal [his] diagnosis."

Ms. Overholser saw Mr. Fingers cell-side on November 28. A correctional officer had to coax him to go to the door to talk with her, and he presented as "uncooperative" and "argumentative." Ms. Overholser wrote in her session notes that she was skeptical of Mr. Fingers's assertions of a worsening mental state: he had been sending "articulate" and "well thought out" requests for health care while claiming to have a "rare" and "serious" mental health issue. She also noted that he refused to speak but clearly had the ability to engage in conversation when he wanted to. She concluded the described behaviors were indicative of the "absence" of any real mental health problems.

Ms. Devore stopped by Mr. Fingers's cell to check in on him the next day. As she approached, she could hear Mr. Fingers being talkative with correctional officers.

Mr. Fingers told Ms. Devore he had feelings of suicidal ideation and his hunger strike was the way to kill himself.

Ms. Overholser saw Mr. Fingers again on November 30. It appears that the lockdown had ended by this time, but Mr. Fingers was still being held in restrictive housing because of either his conduct reports or suicide threats. He told Ms. Overholser that he wanted to "do the right thing" so had stopped his hunger strike, and that he wanted to come off suicide watch and be released from restrictive housing. Ms. Overholser wrote in her session notes that Mr. Fingers appeared "more docile and open to being cooperative." She didn't see any mental health distress, but expressed concern about pulling him out of restrictive housing "versus safety of staff" due to his having smeared his cell with feces less than a few hours earlier. She wrote that he "clearly knows what he is doing," citing to a supposed "long history of acting out with feces for secondary gain." She concluded that he did not present any mental health issues at that time.

*Analysis*

Mr. Fingers's Eighth Amendment claim against the mental health professional defendants—defendants Pintal, Devore, Gibbs and Overholser—is framed in the screening order as a denial of mental health treatment "by refusing to see him from July 17, 2018 to November 28, 2018." The court has thoroughly reviewed Mr. Fingers's medical records, and those records show that Mr. Fingers was neither denied mental health treatment nor "refused" to be seen by these mental health professional defendants in the stated time period.

Nevertheless, during discovery in this case, Mr. Fingers explained that even though he received treatment from the mental health professional defendants in the sense that he was "seen" by them, that treatment was inadequate. To prevail on a deliberate indifference claim, "a prisoner is not required to show that he was literally ignored." Sherrod v. Lingle, 223 F.3d 605, 611 (7th Cir. 2000). "If knowing that a patient faces a serious risk of appendicitis, the prison official gives the patient an aspirin and an enema and sends him back to his cell, a jury could find deliberate indifference although the prisoner was not 'simply ignored.'" *Id.* at 611-12. Mr. Fingers's complaints regarding his mental health treatment as articulated in the record and during discovery are similar to the hypothetical patient in *Sherrod* who is given "an aspirin and an enema and sen[t] him back to his cell."[14] The mental health

---

[14] Mr. Fingers testified at his deposition that the mental health professional defendants' mental health "treatment" was no more than them saying over and over again "you're doing fine; you don't have any complaints," with Mr. Fingers responding, "No, I'm not okay. I'm not fine. . . . Quit trying to downplay it[.]"

31

professional defendants addressed this broader claim during discovery and presented arguments on it in their summary judgment motions. Therefore, the Court will consider Mr. Fingers's claim as the parties have actually litigated it.

### Substantial Risk of Serious Harm

As noted earlier, to prove deliberate indifference against a medical provider, a plaintiff first must show he suffered or was exposed to a substantial risk of serious harm. Perez v. Fenoglio, 792 F.3d 768, 781 (7th Cir. 2015) (citing Farmer v. Brennan, 511 U.S. at 837). Mr. Fingers argues that the risk of serious harm he suffered was psychological distress from the deterioration of his mental health, as well as continued confinement in restrictive housing. There is record support for a jury to find that Mr. Fingers in fact suffered this harm between the end of October through November 2018, as well as that he might have been confined to restrictive housing for the length of time that he was, but for input from the mental health professional defendants regarding his mental health given to custodial authorities.[15]

There is a growing recognition among courts regarding the harmful effects of restrictive housing, formally known as segregation, on inmates who are mentally ill. See Rice ex rel. Rice v. Corr. Med. Servs., 675 F.3d 650, 666-67 (7th Cir. 2012) ("[P]rolonged placement in segregation might have adverse effects on someone in Rice's condition."); Scarver v. Litscher, 434 F.3d 972, 975-96 (7th Cir. 2006) ("There is extensive literature on the effect of . . . isolation . . . on mentally disturbed

---

[15] See, e.g., ECF 161-1 at 17, 21-22, 24, 29, 38, 44-46, 48-49, 65; ECF 102 at 55, 64-67.

prisoners.").[16] Although Mr. Fingers hasn't presented expert testimony on this point, the mental health professional defendants don't appear to dispute that long term segregation can present a substantial risk of harm to inmates with serious mental illnesses, and the court assumes for today's purposes that it does. *See* Blue v. Baenen, 681 F. App'x 524, 526 (7th Cir. 2017) ("We will assume that an inmate assigned to a top bunk who cannot safely access the bed may face a sufficiently serious risk of harm.").[17]

Nevertheless, to establish a disputed issue of fact on whether he was exposed to a substantial risk of serious harm, Mr. Fingers must show that he is among the class of prisoners who would suffer serious harm from continued restrictive housing, that is, he must present evidence to support a jury finding that he in fact has a serious mental illness. "A mental illness is properly characterized as 'serious' based on two features of the diagnosis—one being the duration that the person has the illness and the second being the degree of disability or functional impairment that it causes."

---

[16] *See also* Rasho v. Walker, 376 F. Supp. 3d 888 (C.D. Ill. 2019), *appeal filed* May 22, 2019; Ind. Prot. & Advoc. Servs. Comm'n v. Comm'r, 2012 WL 6738517, at *15-17, No. 1:08-cv-1317-TWP-MJD (S.D. Ind. Dec. 31, 2012); Braggs v Dunn, 275 F. Supp. 3d 1171 (M.D. Ala. 2017); *Graves v. Arpaio*, 48 F. Supp. 3d 1318, 1335–1336 (D. Ariz. 2014); Coleman v. Brown, 938 F. Supp. 2d 955, 979 (E.D. Cal. 2013); Jones 'El v. Berge, 164 F. Supp. 2d 1096 (W.D. Wis. 2001).

[17] Confinement in restrictive housing of an inmate with a serious mental illness might not violate the Eighth Amendment if it is justified by safety considerations or other factors such as the need to closely monitor a suicidal inmate. *See* Scarver v. Litscher, 434 F.3d 972, 975-976 (7th Cir. 2006) ("[T]he treatment of a mentally ill prisoner who happens also to have murdered two other inmates is much more complicated than the treatment of a harmless lunatic."). Although there were times when Mr. Fingers was in restrictive housing for one or both of these reasons, that doesn't appear to have always been the case. If Mr. Fingers were to show he was seriously mentally ill, then the Eighth Amendment might require custodial officials to justify Mr. Fingers's confinement in restrictive housing by evidence he was either at risk for suicide or a security/safety threat to others.

<u>Ind. Prot. & Advoc. Servs. Comm'n v. Comm'r</u>, 2012 WL 6738517, at *8. The evidentiary basis for a jury to infer that Mr. Fingers had a serious mental illness in terms of duration and functional impairment include Mr. Fingers's medical records reflecting a long history of serious mental illness dating back to early childhood,[18] his self-reports concerning the symptoms he was then experiencing, and his behavior while in lockdown and in restrictive housing. Further, the record contains evidence that Mr. Fingers at one time had been diagnosed by a previous Department of Correction treating mental health provider with "atypical psychosis," an Axis I/II impairment.[19] Finally, the mental health professional defendants haven't argued that Mr. Fingers doesn't have an objectively serious medical need. Thus, there is at least a jury question as to whether Mr. Fingers's asserted mental illness is serious enough to have exposed him to a substantial risk of serious harm from lengthy periods of confinement in restrictive housing. *See, e.g.*, <u>Goodrich v. Clinton Cnty. Prison</u>, 214 F. App'x 105, 111 (3d Cir. 2007) (concluding that the plaintiff had presented sufficient

---

[18] The court can consider Mr. Fingers's self-reports as set forth in his medical records as evidence of his childhood history of mental illness on the assumption that Mr. Fingers could testify to the same matters at trial.

[19] An Axis I diagnosis refers to "clinical disorders such as major mental disorders like schizophrenia, bipolar, depression and anxiety disorders," while an "Axis II [diagnosis] includes a variety of personality disorders which are mental disorders that can cause severe personal and social disruption." <u>Ind. Protection & Advocacy Servs. Comm'n v. Comm'r</u>, 2012 WL 6738517, at *7-8.

During the time period at issue in this case, Mr. Fingers's active diagnoses apparently included only Axis IV mood and antisocial personality disorders. An Axis IV disorder generally would not be classified as "serious." *See* <u>Ind Protection & Advocacy Servs. Comm'n v. Comm'r</u>, 2012 WL 6738517, at *8.

evidence of a "serious" medical need where his mental illnesses were diagnosed by psychiatrists as requiring treatment both before and after his incarceration, and where he "provided a vivid description of his [mental] suffering").

*Deliberate Indifference*

Turning to the question of deliberate indifference, Mr. Fingers must point to evidence that the mental health professional defendants were actually aware of the risk of substantial harm and, in the face of that awareness, committed "such a substantial departure from accepted professional judgment, practice, or standards[] as to demonstrate that the person responsible actually did not base the decision on such a judgment." Campbell v. Kallas, 936 F.3d 536, 545 (7th Cir. 2019) (internal quotation marks and citation omitted). The record reflects that, although Mr. Fingers's deliberate indifference claim entails a litany of complaints,[20] those complaints can be described as falling into two general buckets of alleged misconduct—ignoring the mental decompensation that he says occurred beginning in late October through November 2018, and recklessly or deliberately refusing, or contributing to a reckless or deliberate refusal, to diagnose him with a serious mental illness.[21]

---

[20] The mental health professional defendants contend that Mr. Fingers only "vaguely" articulated how his mental health treatment was inadequate. Mr. Fingers's complaints are anything but vague, and the mental health professional defendants understood what they were. *See* ECF 165 at 4-5 (explaining that the "primary undertone" of Mr. Fingers's Eighth Amendment argument was his "belief that the medical entries and his mental health diagnosis had been falsified").

[21] The mental health professional defendants focus on a number of specific issues within these two general buckets, such as whether there is evidence that Mr. Fingers's medical

*Defendant Pintal*

Dr. Pintal saw Mr. Fingers only once, on August 6, 2018. This was before Mr. Fingers's housing unit went on lockdown and Mr. Fingers began to act out in a way that might suggest a significant deterioration of his mental health. The policy or practice at the Miami Correctional Facility is for an inmate to be seen by the first available mental health professional. While Mr. Fingers was arguably suffering mental decompensation from being in lockdown, he was only seen by defendants Devore, Gibbs, and Overholser. If Mr. Fingers had asked to see Dr. Pintal specifically in this time period, as a note in one of Mr. Fingers's medical records suggests,[22] there is no evidence that Dr. Pintal was ever informed of this request. Because there is no evidentiary basis for a jury to find that Dr. Pintal was subjectively aware of Mr. Fingers's asserted mental decompensation in November 2018, Mr. Fingers's Eighth Amendment claim against Dr. Pintal arising out of that alleged decompensation fails as a matter of law. *See* <u>Sanville v. McCaughtry</u>, 266 F.3d 724,

records were "falsified," whether they were "qualified" to diagnose his mental illnesses, and whether they had the authority to transfer Mr. Fingers outside Indiana Department of Correction custody to a civil mental hospital. The court interprets Mr. Fingers's arguments about these specific matters as simply his way of saying the mental health professional defendants refused to diagnose him correctly. This includes Mr. Fingers's assertions that his medical records have been "falsified"; Mr. Fingers uses the word "falsified" to mean that the mental health professional defendants reported he had no serious mental health issues when they know he does.

[22] In hindsight, some of the requests for health care and grievances Mr. Fingers filed from the end of October through November might have been intended as healthcare requests to be seen by either Dr. Pintal or one of the other psychologists on staff at the Miami Correctional Facility (Dr. Lee or Dr. Copeland). It is likely, however, that they were not interpreted that way because they read more like complaints about the qualifications of the mental health providers by whom Mr. Fingers was being treated, a charge that was deemed to be without merit, than a request for an appointment with a particular provider.

735 (7th Cir. 2001) ("Not noticing that an inmate exhibits a serious medical need does not violate the Constitution.").

Insofar as Mr. Fingers's claim against Dr. Pintal involves deliberate indifference by not properly diagnosing his mental health illnesses, that, too, fails for lack of evidence that Dr. Pintal knew Mr. Fingers suffered from a serious mental illness requiring a change to his diagnoses. A reasonable jury might conclude that Dr. Pintal intentionally downplayed Mr. Fingers's mental health issues, but that wouldn't mean he knew Mr. Fingers's mental health diagnoses were wrong. Mr. Fingers's testimony that Dr. Pintal said it was his job to make sure Mr. Fingers never got out of prison isn't sufficient standing alone for a reasonable jury to infer an intentional or reckless misdiagnosis, or cover-up, of Mr. Fingers's mental illnesses.

*Defendants Devore, Gibbs, and Overholser*

Unlike Dr. Pintal, defendants Devore, Gibbs, and Overholser had numerous sessions with Mr. Fingers from July through November. But during November 2018 when Mr. Fingers was exhibiting outward signs of severe mental illness and/or mental decompensation, Mr. Fingers was seen primarily by Ms. Overholser. Given Ms. Gibbs's and Ms. Devore's limited contact with Mr. Fingers in this time period, the evidence is insufficient to show that either one could have been subjectively aware of Mr. Fingers's alleged mental decompensation.

Insofar as Mr. Fingers's claim involves a failure to diagnose, defendants Devore, Gibbs, and Overholser weren't indifferent in the treatment they provided— they met with Mr. Fingers numerous times, observed and reported about any suicide

risk, noted his reported symptoms, described his relevant affect and behaviors that were mental health in nature, and tried to provide Mr. Fingers guidance in the form of individualized therapy. But their frequent contact with Mr. Fingers and apparent responsibility for day-to-day management of his mental health issues suggests that they played an important part in the overall process by which Mr. Fingers was, or as he claims, was *not,* properly diagnosed. Defendants Devore, Gibbs, and Overholser assert that it was up to a treating psychologist or psychiatrist, not them, to change Mr. Fingers's mental health diagnoses. That statement doesn't foreclose liability: they might be found deliberately indifferent if they recklessly or intentionally failed to report a need to a treating psychologist or psychiatrist for reassessment of Mr. Fingers's diagnoses if reassessment or rediagnosis was called for based on symptoms reported to or behaviors observed by them during monitoring or therapy sessions. Nor are defendants Devore, Gibbs, and Overholser absolved of misconduct (if there was any) by the fact that psychologists and psychiatrists also met with Mr. Fingers in the same time period; those other professionals would have taken into account the treatment and assessment notes of defendants Devore, Gibbs, and Overholser in addition to their own impressions in making decisions regarding Mr. Fingers's diagnoses. Finally, the record contains ample evidence that Ms. Overholser—not Drs. Pintal, Lee, or Copeland—advised custodial authorities regarding the seriousness of Mr. Fingers's mental illness for purposes of a decision by those authorities as to Mr. Fingers's housing placement.

Negligence in diagnosing a medical condition is not a "valid claim of medical mistreatment under the Eighth Amendment." Sanville v. McCaughtry, 266 F.3d at 734. But if the evidence shows the mental health professional defendants were reckless in "avoid[ing] knowing," Blue v. Baenen, 681 Fed. App'x at 526, that Mr. Fingers was misdiagnosed, or that they intentionally misdiagnosed him, or covered up the seriousness of his mental illnesses, then summary judgment would not be appropriate. The "linchpin" to such a claim is whether the evidence is sufficient to support a finding of "lack of professional judgment." Campbell v. Kallas, 936 F.3d at 545.[23]

This record couldn't support a finding that defendants Devore and Gibbs didn't base their medical judgments reflected in Mr. Fingers's medical records on something other than professional judgment, even if they seemed to discount or write-off as insignificant reported symptoms that might have justified a different diagnosis than Mr. Fingers had at the time. As noted, there is insufficient evidence that they were aware of the degree to which Mr. Fingers's mental health appeared to have deteriorated after October 29, 2018, so a reasonable jury would have to find that these defendants exercised professional judgment in evaluating Mr. Fingers and analyzing

---

[23] See Holloway v. Del. Cnty. Sheriff, 700 F.3d 1063, 1074 (7th Cir. 2012) (prison doctor "is free to make his own, independent medical determination as to the necessity of certain treatments or medications, so long as the determination is based on the physician's professional judgment"); Rodriguez v. Plymouth Ambulance Serv., 577 F.3d 816, 832 (7th Cir. 2009) (allowing claim to advance that "alleged implicitly that [inmate's] treatment . . . was not based on a legitimate medical judgment").

"his [mostly pre-October 29, 2018] behaviors in light of his reported history of faking or exaggerating symptoms." Goetsch v. Ley, 444 F. App'x 85, 88–89 (7th Cir. 2011).

The case of defendant Overholser is a closer call. Mr. Fingers's medical records show constant oversight by Ms. Overholser from the end of October through November 2018, such that there can be little dispute that she knew of Mr. Fingers's extreme behaviors in that time period. Yet she did little more than note his reported symptoms before going on to conclude that he had "no mental health issues" at that time. A jury might find that she exaggerated the degree to which normal functioning behaviors cancelled out non-normal functioning behaviors or "proved" that those non-normal behaviors were faked. A jury could view Ms. Overholser's frequently caustic comments in Mr. Fingers's medical records about her opinions regarding motivations behind Mr. Fingers's extreme behaviors as an indication she was basing her opinions on something other than professional judgment. See Dixon v. Godinez, 114 F.3d 640, 645 (7th Cir. 1997) (deliberate indifference can be inferred from evidence of a provider's "sarcastic responses" to the prisoner's complaint" suggesting the provider's "knowledge of the condition, and [his] refusal to take steps to prevent it").

"The Constitution does not oblige [prison officials] to believe whatever inmates say." Riccardo v. Rausch, 375 F.3d 521, 527 (7th Cir. 2004). But prison officials can't avoid liability for deliberate indifference merely by saying that they didn't believe the inmate's complaints about his suffering. Deliberate indifference will be found if there was a reasonable way for the prison officials to "separate fact from fiction." Id. The logic behind the rule is that if what the inmate is saying is true, then there likely is

some kind of objective evidence to confirm or support it. But there is no blood test or x-ray to confirm an inmate's reports of mental distress. Diagnosing or evaluating mental illness *requires* the provider to take into account self-described symptoms when separating fact from fiction. Objective evidence that likely would be considered in addition to self-reported symptoms includes the patient's behavior. Mr. Fingers's behavior in the time period in question involved suicide threats, a hunger strike, an attempt to cut his cellmate's brain out with a razor, and the spreading of excrement over himself and the cell. Even if this behavior was motivated in whole or in part by a desire to manipulate, a person qualified in the field might see the behavior as indicative of a seriously mentally ill person. *See* Lori Marschke, *Proving Deliberate Indifference: Next to Impossible for Mentally Ill Inmates*, 39 Val. U. L. Rev. 487, 520 n.211 (2004) ("[B]ehavior such as self-mutilation can be both manipulative and a symptom of a major mental disorder simultaneously.").

Prison health care providers must exercise professional judgment in determining whether an inmate is faking symptoms of severe mental illness. *See* Tillery v. Owens, 719 F. Supp. 1256, 1286 (W.D. Pa. 1989) (noting that prison mental health staff have a tough job of "determining who is bad and who is mad—who requires limiting and restricting and who requires nurturing and care," as they typically "see dual problems in inmates who are anti-social and also schizophrenic"), *aff'd*, 907 F.2d 418 (3d Cir. 1990). Given the difficulties prison mental health providers face, a court should be wary of substituting "its judgment for theirs in the absence of substantial evidence in the record to indicate that the officials have

exaggerated their response to these considerations." <u>Meriwether v. Faulkner</u>, 821 F.2d 408 (7th Cir. 1987); *see also* <u>Scarver v. Litscher</u>, 434 F.3d at 967-977 ("Federal judges must always be circumspect in imposing their ideas about civilized and effective prison administration on state prison officials.").

The deliberate indifference standard sets a very high bar of proving subjective awareness. A reasonable jury reviewing Ms. Overholser's written evaluations of Mr. Fingers could reach only one conclusion—that she believed Mr. Fingers's extreme behaviors weren't an indication of mental suffering; rather, she firmly believed that he could control his behavior and was acting out on purpose. "[E]ven if a risk is obvious—i.e., even if it was well-documented in [the prisoner's] file that he had a mental illness that, if left untreated, would pose substantial risk to his health—the prison official is not liable under the Eighth Amendment if the obvious escaped him." <u>Sanville v. McCaughtry</u>, 261 F.3d at 735 n.5 (internal quotation marks and citation omitted).[24]

---

[24] Even if Ms. Overholser believed Mr. Fingers was genuinely experiencing mental distress from being confined to his cell, she couldn't have done anything about the lockdown that applied to all inmates in Mr. Fingers's housing unit at the time. *See, e.g.*, <u>Rice v. Corr. Med. Servs.</u>, 675 F.3d at 666-667 (affirming dismissal of claim that conditions of segregation violated Eighth Amendment for plaintiff's failure to identify feasible alternative). The requirement of feasible alternatives wouldn't completely justify a failure to take any actions to help Mr. Fingers, however, because there were other things she could have done, such as schedule him to be seen by a psychologist, who could then evaluate his mental illnesses in light of any effects that the lockdown was having on his mental health, or else refer him to a prescribing provider for possible adjustments to his medication. She did neither of those things because she didn't think he was actually suffering mental distress. In addition, the record contains evidence indicating that Ms. Overholser was involved in evaluating Mr. Fingers for purposes of maintaining his restrictive housing assignment outside of the period when his housing unit was on lockdown. As to those time periods, the feasible alternative analysis would not apply unless there was some evidence of Mr. Fingers being a safety threat or suicidal.

Mr. Fingers simply hasn't marshalled sufficient competent evidence for a jury to find in his favor on his claim against Ms. Overholser. While a jury could conclude that Mr. Fingers is seriously mentally ill and that he was actually suffering from mental decompensation in November 2018, and further could conclude that Ms. Overholser should have treated him differently than she did, there is insufficient evidence in the record for a jury to find that Ms. Overholser subjectively believed Mr. Fingers was actually suffering from mental deterioration from the end of October through November 2018, that he needed to see a psychologist or psychiatrist at any point, or that his diagnoses of a mood disorder and antisocial behavior disorder were incorrect. Ms. Overholser is entitled to judgment as a matter of law.

CONCLUSION

For the foregoing reasons,

1.    The court GRANTS the motion for summary judgment filed by defendant Pintal, ECF 145.

2.    The court GRANTS the motion for summary judgment filed by Defendants Bridenthal, Devore, Gibbs, and Overholser, ECF 150.

3.    The court GRANTS the motion for summary judgment filed by Defendants Koons, Kendall, Miller, Herrington and Price, ECF 153.

4.    The Clerk shall enter judgment in favor of the defendants and against the plaintiff.

SO ORDERED on September 29, 2021

s/ Robert L. Miller, Jr.
JUDGE
UNITED STATES DISTRICT COURT